[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This divorce case involves a mentally ill mother who will not take medication nor participate in recommended treatment, children who have been abused and frightened, a father who is currently fulfilling dual roles in his children's lives and extraordinary expenses, legal and otherwise, occasioned by the inability of the medical and legal systems to cope effectively with mentally ill people who refuse treatment.
The plaintiff and the defendant, whose maiden name was Gay K. Dodd, were married on August 17, 1969 at Harrington, Long Island. They have four children: Kimberly Dawn Henin born January 3, 1974, Michael David Henin, born May 12, 1978, Jonathan Andrew, born April 12, 1984 and Steven Christopher, born April 18, 1986. The Henins married while the plaintiff husband was completing dental school. The defendant wife, who completed her Bachelor of Arts degree in fashion merchandising, was employed at that time as a dress department manager for $8500 per year. This salary she used to pay all her student loans because his parents paid for their living expenses. After her employment for a year, the wife was severely burned in an automobile fire which caused her to be out of work for several months. Shortly, thereafter, in 1972, the plaintiff Dr. Henin was placed on active duty as a dentist with the Air Force. Mrs. Henin accompanied her husband to his Air Force assignment at Mather Air Force Base in California. At that time, there was some disagreement between the parties over her failure to secure a job in California but not a serious enough disagreement to prevent the couple from purchasing a home for $23,500.00 with a $1,000.00 down payment. Nor was the disagreement between the parties serious enough to prevent their first child, Kimberly from being born in 1974.
Shortly after Kimberly's birth, Dr. Henin's tour with the Air Force ended and after a brief sojourn in Oregon, the couple CT Page 544 sold their house in California for a seven thousand dollar profit and moved back to New York. In New York, they lived with the husband's parents while he worked at two part-time jobs.
In 1976, the husband secured a full time job with Dr. Badner, a dentist in South Windsor, Connecticut and the family moved to South Windsor where they initially rented and subsequently purchased a home. Dr. Henin worked for Dr. Badner for approximately five years. During that time their second child, Michael David, was born. Also, during this period of time, the parties became active as "Born Again Christians." In 1980, the plaintiff borrowed $85,000 and started his own practice in Glastonbury. The plaintiff worked hard at his role as breadwinner and the wife her role as homemaker.
Until 1983, the only complaint above and beyond normal marital issues was the husband's perception that the wife was becoming two embroiled in church activities to the detriment of the family and home. In 1983, an event took place that dominated the rest of the parties marital existence. In 1983, the defendant had what appeared to be a psychotic episode: she was found lying on the floor, foaming from the mouth and hearing voices.
During the next four years the parties sought pastoral counseling for the defendant's condition which appeared to deteriorate. Despite the recommendations of those counselors, she refused to seek more intensive professional psychiatric treatment. From 1983 to 1987, the parties had two additional children and bought a new house in what would appear to be a misguided and desperate attempt to satisfy Mrs. Henin's demands and ameliorate her condition.
In 1987, the plaintiff sought the help of probate court, but was stymied with the lack of an expert and the stringent tests required for commitment. During that year, the Department of Children and Youth Services intervened as a result of complaints concerning Mrs. Henin's behavior with the children. Faced with the reality of a neglect claim, Dr. Henin responded with a complaint seeking a legal separation from his wife. It was his hope that this would free her to seek psychiatric help. It did not. In May 1988, the plaintiff changed his claim for relief to a dissolution.
During the pendency of this dissolution action, certain significant legal events occurred. On February 17, 1988, Attorney Barbara Ruhe was appointed attorney for the minor children. On May 4, 1988, Attorney Kligerman was appointed guardian ad litem of the defendant. She was also appointed conservatrix of the estate of the defendant, by the probate CT Page 545 court. Temporary Custody of the children was awarded to the plaintiff with the order that the children not be left alone with the defendant. Evaluations of the parties and children were ordered, the cost to be borne by the plaintiff. One month later on June 8, 1988, the plaintiff was awarded exclusive possession of the family home. He was ordered to provide housing accommodations together with expense money of $175.00 per week to the defendant. On March 17, 1989, a motion filed by the children's attorney for a psychiatric evaluation of the defendant was ordered by the court. By May 30, 1989, she was found in contempt because she failed to keep the appointment for psychiatric evaluations. In addition, the defendant was ordered to stay away from the family residence and to refrain from going near the children's school while they were in attendance. In September of 1989, the defendant agreed to be examined by Dr. Marvasti, a psychiatrist, as a result of the issuance of a capias on May 31, 1989. Dr. Marvasti, committed the defendant to the Institute of Living in September, 1989 on a 15 day emergency certificate. She was in the Institute of Living from September 21, 1989 until November 24, 1989. Her discharge diagnosis was schizophrenia, undifferentiated, chronic. Her progress was guarded because of her resistance to voluntary treatment.
It is interesting to note that Mrs. Henin, despite her illness, was capable of conforming to court orders when directly confronted with their coercive effect. She has not visited the children's school; she has stayed away from the family home and she did see a psychiatrist when the choice was that or Niantic. Dr. Sugarman, her treating psychiatrist, opined that her desire to see her children could overcome her reluctance to future treatment, if she was truly faced with their loss.
The court finds that the plaintiff has proven the allegations of his complaint and therefore, dissolution may enter on the grounds of irretrievable breakdown. The court further finds that the breakdown was occasioned by the failure of the defendant to seek medical treatment and her consequent behaviors that rendered the marriage unworkable.
Issues
The parties have raised issues of custody, visitation, support, alimony, property division and attorney's fees for the court's decision. The court has considered the criteria in the following statutes in arriving at its decision on those issues: Conn. Gen. Stat., Sec. 46b56, custody and visitation, Conn. Gen. Stat., Sec. 46b62, attorney's fees, Conn. Gen. Stat. Sec. 46b81, division of property, Conn. Gen. Stat., Sec. 46b82, alimony, and Conn. Gen. Stat., Sec. 46b84 parents obligation. The court has also considered the interface of these statutes in arriving at CT Page 546 its decisions.
Custody and Visitation
The defendant suffers from untreated undifferentiated schizophrenia which not only affects her ability to parent but has presented behaviors that have threatened the well being of the children. The children's counselor recounted experiences of the older children where they were punched, slapped and had their mother's hand placed tightly over their mouth. In addition, they recalled episodes where they were forced into the automobile and driven around aimlessly. It is in the best interests of the children that the custody of the children be with the plaintiff husband and that visitation be limited to approximately two hours per month. Such visitation should be monitored in a non-public place by a professional to insure the children's protection. Normally, such visitation shall take place with all children present.
The court recognizes that the volatility of the situation may require immediate decisions to alter such visitation before the court orders may be effectively changed. Accordingly, the children's counselor shall have the authority to increase, decrease or terminate visitation pending further order of the court, such changes shall be immediately brought to the court's attention for approval or disapproval unless the parties agree to them. Additionally, the temporary orders restraining the defendant from going near the children's school grounds when the children are in attendance and restraining the defendant from going near the family home are continued as permanent orders until further order of the court for the children's protection.
Financial ORDERS
Support — Alimony — Property
Division — Counsel Fees
Section 46b84 of the Conn. Gen. Stat. provides that upon dissolution of the marriage the parents have an obligation to maintain their children in accordance with their respective abilities and their children's needs. In determining the abilities of the parents the court must consider their age, health, status and occupations, earning-capacity, amount and sources of income, estate, vocational skills and employability of each of the parents. Sec. 46b81 dealing with division of property between the parties aside from their obligation to their children lists the same factors for the court to consider but in addition, the causes for the dissolution, the needs of the parties and the opportunity of each for future acquisitions. CT Page 547 The court, also, is required to consider the contributions of each in the acquisition, preservation or appreciation, i.e., value of their respective estates. Section 46b82 of the Connecticut General Statutes, dealing with alimony, considers the same factors as Sec. 46b81 but it also requires the consideration of awards under Sec. 46b81. Section 46b62 of the Connecticut General Statutes dealing with attorney's fees utilizes the same criteria as Section 46b82.
It is clear that the four children, who have been subjected to trauma, have required and will continue to require stable housing, continued private education, a nanny as well as counseling. Although the plaintiff earns a good living — approximately $2400 per week after taxes, the children's needs make a big dent in his income. The defendant who is currently employed in a supermarket has minimal capacity for earnings so long as she refuses treatment and medication. Her educational background, intellectual capacity, age and early employment indicate that she could be employed more appropriately, if she took her medication, and that was recognized by her conservatrix's testimony. The parties net assets exclusive of the dental practice is approximately $230,000, $190,000 of which is tied up in the family home and $15,000 in furniture. Juxtaposed to this are counsel fees owed to defendant's legal counsel in the amount of $28,000 — $4725 to the defendant's guardian ad litem as well as $9000 for plaintiff's own counsel. In addition, there will be counsel fees for the children's attorney. The net value of the defendant's dental practice is estimated between $71,000 and $200,000 after deduction of liabilities. The court finds the value closer to the value supplied by the plaintiff's expert than the defendant's. It is to be noted that this asset (the dental practice) generates the income necessary to support the children as well as to pay alimony to the defendant.
Accordingly, the court enters the following financial orders:
 1. Plaintiff shall be responsible for the support of the four minor children.
 2. Plaintiff shall pay to the defendant the sum of $400 — per week as periodic alimony which will terminate at the earliest of the following events:
a) the defendant's death
b) the defendant's remarriage CT Page 548
c) April 12, 2004.
 This periodic alimony shall be non-modifiable as to length of time.
 3. Plaintiff shall continue his current health insurance or its equivalent for the benefit of the defendant for the three year COBRA period at his cost.
 4. Plaintiff shall make the defendant beneficiary of $200,000 of his current life insurance during the period he is obligated to pay periodic alimony.
 Plaintiff may substitute a declining term life insurance policy to cover his life insurance obligation, the amount to diminish as his periodic alimony obligation diminishes.
 5. Plaintiff shall indemnify and save defendant harmless from the Master Card, Visa Card and debts to his family listed on his affidavit.
 6. In accordance with Sec. 46b81 of Connecticut General Statutes, the court assigns all the defendant's right, title and interest to the family home at 127 Haystack Road, Manchester, Connecticut to the plaintiff. Plaintiff in turn will execute a mortgage deed and note to the defendant in the amount of $100,000 with simple interest at the rate of 7%, principal and interest payable at the earliest of the following events:
a) Plaintiff's death
b) Plaintiff's remarriage
 c) The premises at 127 Haystack Road no longer being used as a residence for the children.
d) April 18, 2004
 7. Plaintiff shall be responsible for defendant's attorney's fee, to the extent of $20,000, defendant's guardian ad litem fees, to the extent of $4,750, children's counsel fees CT Page 549 in the amount of $6,000. He shall pay one half within 6 months from date and the balance within one year from date.
Judgment may enter in accordance with this Memorandum of Decision.
BARALL, JUDGE